THE MORTON MOTOR COMPANY *vs.* LEON W. PILLSBURY.

Franklin.   Opinion March 21, 1928.

*Currier C. Holman*, for plaintiff.
*Cyrus N. Blanchard*, for defendant.

SITTING: PHILBROOK, DUNN, BARNES, BASSETT, PATTANGALL, JJ.

BARNES, J.   The Plaintiff is a corporation, doing, at Farmington, the business of selling motor vehicles, and the defendant a farmer who resides at Rangeley and retails milk.

In the spring of 1927, defendant owed a final payment on a truck, bought of the plaintiff a year before, and due on May 31.

On May 28, he purchased and received from plaintiff a second truck, paying $241.00 down, and agreeing to pay the further sum of $504.00 in equal monthly installments.

Both sales were "financed by the General Motors Acceptance Corporation," of Boston, Mass., which, so far as affecting this

case, advanced to the plaintiff the unpaid balance of the purchase price of the cars, received assignments of the sales contracts, made demand for payments as they fell due, furnished a representative to confer with plaintiff regarding deferred payments, and charged back to plaintiff accounts uncollectable. The contracts, signed in triplicate by both plaintiff and defendant, were of conditional sales and were recorded in Rangeley.

Both seller and assignee had originals of the contracts, the seller retaining the notes until paid.

On June 22, defendant drew a check payable to the Acceptance Corporation for the balance due on the truck purchased in 1926 and mailed it to the Acceptance Corporation, by whom it was received on the 24th.

As was its custom, the latter, within three weeks of this date returned its copy of sale contract of 1926 to plaintiff, and, on July 16, plaintiff's bookkeeper, as she testified, intending to mail him his 1926 note, sent him, by mistake, the 1927 note, marked "paid," together with a letter of plaintiff's treasurer informing him the note was "duly paid."

In the latter part of July, the Acceptance Corporation notified plaintiff that defendant had paid nothing on his 1927 note, and plaintiff discovered in its file the 1926 note and not that of 1927. The situation was immediately discussed by the parties to the sale and it was found that defendant claimed he had paid the 1927 note.

A replevin writ was promptly made and the truck repossessed by the plaintiff. Upon trial a verdict was returned for the defendant, and the case came to this court on the general motion.

It is said that the verdict of a jury will not be set aside, when the testimony is conflicting, if it is found that the verdict is supported by evidence that is credible, reasonable, and consistent with the circumstances of the case, so as to afford a fair presumption of its truth. No questions of law are here involved. The issue is simple, and confined to the one question, was the 1927 contract performed by payment of $504.00?

This contract specified that the balance of $504.00 was "payable at the office of General Motors Acceptance Corporation, in six installments of $84.00 each," but defendant furnished testi-

mony that the balance was paid in full by him, on July 11, in bills placed in an envelope, stamped but not registered, addressed to the plaintiff and deposited in the post office at Rangeley.

Defendant must go further and present evidence that by itself, aided by inferences properly to be drawn therefrom, tends to prove that some official of plaintiff corporation or one of its servants actually received the money from the post office officials at Farmington. Of this essential step in the performance of his contract defendant furnished no direct evidence.

He testified to making up the package of money, and that he mailed it. His wife testified to aiding him in making up the package. Two young men who were employed in the delivery of milk testified to seeing in the milk room at defendant's farm, on the morning of July 11, an envelope addressed to Morton Motor Co., and that defendant then said he was going to Rangeley and would mail it.

On this presentation defendant argues that men of ordinary prudence should infer that the money was delivered to plaintiff, or to some one whose possession would be considered that of the plaintiff.

Regarding payment, the testimony is short, and as follows:—

Miss Cunningham, the bookkeeper, testified that the man in the store brought in the mail, and that Mr. Lloyd Morton, or J. C. Morton, opened the mail. Further that she kept the cash account, and that defendant was not credited with any money from the 11th to the 16th of July, 1927.

Mr. Lloyd Morton, treasurer of plaintiff corporation, testified that payment on the 1927 sale contract was never made by defendant to plaintiff; that Miss Cunningham, "immediately after this trouble came up about Mr. Pillsbury's not paying," reported that she had sent Pillsbury the 1927 note by error, and that he at once talked with Mr. Pillsbury, by telephone.

His testimony reads: "I asked Mr. Pillsbury if he had paid the note, and he said he had, and I asked him in what manner. He said by money order he thought. At first he said he paid it by money order. Then he said, "I am not sure, might have been cash or check. I am not sure about it. Those are practically the exact words."

"Q. Did you have any further talk with him?

"A. Not at that time. He said he would look it up, and let me know.

"Q. He claimed at that time it had been sent to Farmington?

"A. That was what I implied from what he said.

"Q. That it had been paid to you?

"A. Yes, but before he got done talking he wasn't sure whether he paid it at Farmington or not."

On cross-examination, this witness was very positive that defendant said at first that he had mailed to plaintiff a money order; then that he had sent by cash, or by check, and finally that he was not sure how he had sent the payment, but that he would look it up.

Mr. J. C. Morton, president of plaintiff corporation, testified that when the matter was brought to his attention he called defendant by telephone, and asked him if he claimed he had paid the 1927 note, and that defendant replied, "No, I haven't. I thought I had and told your son I had, and found I haven't. The money order lays here in the house, and hasn't been mailed."

He testified that he stated the circumstances of the error by which defendant had received the wrong note, and that defendant promised to return it; that it was not returned, and that when he again talked with defendant, the latter replied, "What are you trying to do? I have paid that in full, and I have the cancelled note, and let's see what you can do about it, if you can."

A third witness, Mr. Marshall, field representative of the Acceptance Corporation, testified to a conversation with defendant before suit was brought. Mr. Marshall testified: "He told me he had sent the bill in full to the General Motors Acceptance Corporation in Boston. I asked him how he had sent it. He said by money order, and I requested a receipt number, as is usually the case. He said he was in the field, and couldn't get it, and would go back to the house and would get it."

When the sheriff testified, he said that, at the farm, before service of the writ, defendant said: "I sent the $504.00 by mail," and when asked if he had registered the envelope, replied "No, sir, I did not."

Defendant testified that on the 11th of July he sent the $504.00, in cash, by mail, addressed to plaintiff and not registered.

He admitted having a telephone call from plaintiff the first of July, but denied any conversation about payment due on the 1927 contract. He admitted being called by the president of plaintiff corporation; claimed he then said the first truck was paid for by check, and the latter in cash, and denied any statement about a money order. In cross-examination he denied ever having any talk with Mr. Marshall, and said he did not know that plaintiff got the money, except that he had received the cancelled note.

He claimed he was producing and selling the milk of 30 cows; that he was paid by checks and by cash; that he kept a checking account with a Skowhegan bank, and had banked in Rangeley; that he paid some of his bills by check.

As to the payment of $504.00, he testified the pile of bills consisted of two or three fifties, some large and some small bills, "fifties and twenties and tens and fives and ones."

His wife testified that she placed the money in an envelope, and that she counted it twice. Under cross-examination she testified the money was made up of one fifty dollar bill, ten twenties, and the rest fives and ones. This she said she put in a large white envelope that she had bought at Oquossoc about three years before, not a government envelope, an unstamped envelope.

Here we have a defense, detailed, precise, particular, and convincing, if credible, reasonable, and consistent with the circumstances of the case.

But to believe defendant's testimony is to regard that of plaintiff's witnesses as wilfully false.

Here is not a case where the different versions of the opposing parties can be reconciled and harmonized. This is a case of the class, fortunately rare, wherein one party or the other takes refuge in perjury.

Under the circumstances which is to be accepted as true?

It seems neither credible nor reasonable that a man of even slight business experience would drop into the current of the postal department an unregistered parcel containing so large a

sum of money; that one who had for years maintained and checked against a bank account, without availing himself of the safeguards that his testimony shows this defendant was familiar with, would have mailed a package of money of the bulk that the claimed payment must have assumed, when ordinary prudence would demand payment by check.

A circumstance of appealing force, and seemingly effective in our search for the truth, is that an envelope containing money, in bills, to this amount would be so distended as to attract notice.

Defendant and his wife are the only witnesses as to the contents of the envelope. The testimony of his employees, as summarized above, has but trifling probative effect. One says he saw an envelope, the other an extra-large envelope, addressed to plaintiff.

If the wife's story be true, the envelope contained sixty-five or more bills, and since they had been taken in trade they must have bulked large.

If the jury thought of this at all, some of them surely must have known, and it would be their duty to convince any who might not know it, that a pile of used bank bills, sixty-five in number, would be a package of very considerable thickness, and would swell almost beyond the capacity of any ordinary large envelope.

But, further, if her story is true, it seems that a thinking man must conclude that either her husband, or one of the post office employees, or the man who carried the mail to the Morton office, yielded to love of money while handling the tempting envelope, and diverted the money. If any but the last carrier stole the envelope, the payment was not made. On the other hand, if the Mortons, their bookkeeper, Mr. Marshall and the Sheriff are to be believed, the nicely calculated defense falls.

After a thorough and painstaking review of the entire record, giving full credence to all pertinent inferences that it seems to us a reasonable mind might draw therefrom, we conclude that defendant's story is not credible; that the statements of plaintiff's witnesses contain the true version of the matter, more convincing because not reported in exactly similar, unvarying phrases.

The jury must have found that plaintiff mailed the money. To us it seems rather that, fortified by what he considered a receipt in full, defendant fell before temptation.

We find no payment proved.

*Motion sustained.*
*New trial granted.*